UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

IN THE MATTER OF THE SEARCH OF    )
THE RESIDENCE, PREMISES,          )    CASE NO. 1:17-MJ-143
OUTBUILDINGS, AND VEHICLES        )
LOCATED AT 709 WEEKS DRIVE NE,    )
CLEVELAND, TENNESSEE              )

## AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

The affiant, Rodd Watters, having been first duly sworn, deposes and states as follows:

1. This affidavit is submitted in support of a search warrant for the premises, residences, outbuildings and vehicles in custody and/or control of by Chase Christian which are located at 709 Weeks Drive NE, Cleveland, Tennessee. I have been an officer with the Tennessee Bureau of Investigation (TBI) since 1997. Prior to this, I was a police office for five and one-half years with the Clarksville Police Department. I am a Task Force Officer ("TFO") with the Drug Enforcement Administration's ("DEA") Chattanooga Office. I have served as a TFO with DEA for approximately one year. In the performance of my duties as a TFO and investigator, I have conducted many investigations involving illegal drugs, auto theft, robberies, burglaries, homicides and other general criminal investigations throughout my career in law enforcement. This search warrant affidavit is in support of a search warrant for the residence of Chase Christian.

2. I have received specialized training in the investigation of criminal activity from the TBI, as well as various other state law enforcement agencies, and have kept abreast of criminal activities, case developments, procedures, investigative techniques, and other standardized methods of investigation involving property crimes during this time period. I have worked with federal, state, and local agencies in investigations in which stolen properties were recovered and have participated in numerous searches of

Page 1 of 12

persons and places for the purpose of recovering stolen goods. I have participated in Organized Crime Drug Enforcement Tasks Forces (OCDETF) in which narcotics were possessed, bought, sold, and traded and have assisted in the application and service of search warrants and arrest warrants in these cases.

Based upon your affiant's training, experience, and participation in investigations involving the distribution of narcotics, your affiant knows:

(a) That drug traffickers very often place assets in names other than their own to avoid detection of these assets by government agencies;

(b) That drug traffickers very often place assets in corporate entities in order to avoid detection of these assets by government agencies;

(c) That even though these assets are in other persons' names, the drug dealers actually own and continue to use these assets and exercise dominion and control over them;

(d) That large-scale narcotics traffickers must maintain on hand large amounts of U.S. currency in order to maintain and finance their ongoing narcotics business;

(e) That narcotics traffickers frequently maintain books, records, receipts, notes ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances and chemicals. That narcotics traffickers commonly "front" (provide narcotics on consignment) controlled substances to their clients; that the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where the traffickers have ready access to them;

(f) That it is common for narcotics traffickers to maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds, and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned books, records, receipts, notes, ledgers, etc., are maintained where

the traffickers have ready access to them;

(g) That it is common for large-scale drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their residence, their businesses their vehicles, and/or other locations which they maintain dominion and control over, for ready access and to conceal these items from law enforcement authorities;

(h) That, in order to accomplish this concealment, narcotics traffickers frequently build "stash" places within their residences or businesses. That there are a number of publications available instructing where and how to build "stash" places. Copies of these types of publications have been found in the residences of narcotics traffickers;

(i) That it is common for persons involved in large-scale narcotics trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment, and/or expenditure of narcotics proceeds, such as: currency, financial instruments, precious metals and gemstones, jewelry, books, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, money orders, bank drafts, cashier's checks, bank checks, safe deposit box keys, and money wrappers. These items are maintained by the narcotics traffickers within their residences, businesses, or other locations which they maintain dominion and control over;

(j) That large-scale traffickers often utilize electronic equipment such as computers, telex machines, facsimile machines, currency counting machines, and telephone answering machines to generate, transfer, count, records and/or store the information described in items a, c, d, e and g above;

(k) That when drug traffickers amass large proceeds from the sale of drugs and/or chemicals that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize several means, including but not limited to: domestic

and international banks and their attendant services, securities brokers, professionals such as attorneys, and accountants, casinos, real estate, shell corporations and business fronts, and otherwise legitimate businesses which generate large quantities of currency;

(l) That the sale of controlled substances generates large quantities of United States currency in small denominations (commonly referred to as "street money");

(m) That it is common for drug dealers to physically handle and count the "street money" after receiving it in exchange for the controlled substances, thereby leaving residue traces of controlled substances on the "street money"; that law enforcement agencies own dogs which are trained to react to the scent of controlled substances and residue traces of controlled substances; and that those trained dogs have reacted to narcotics tainted currency negotiated at banks and concealed in the residences of narcotics traffickers;

(n) That it is common for drug dealers to separate their "street money" by denomination and put this currency in rubber banded stacks in varying $1000.00 increments to facilitate quick counting;

(o) That the courts have recognized that the small and medium denominations of questionable currency, along with the manner in which the currency is handled, carried and concealed may establish probable cause that there is a substantial connection between the questionable currency and narcotics transactions;

(p) That the Currency Transaction Report (CTR) (IRS form 4789), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction which exceeds $10,000 causes tremendous problems for narcotics traffickers when they attempt to negotiate their illegal profits at a financial institution;

(q) That, in order to evade the filing of a CTR, narcotics traffickers often "structure"

their currency transactions so that no one transaction exceeds $10,000 or they provide false or misleading information in an attempt to legitimize or conceal the source and/or ownership of the currency;

(r) That narcotics traffickers at times become fearful that their extravagant spending habits will bring them under scrutiny by the Internal Revenue Service or other federal, state, or local agencies. In order to legitimize their spending, these traffickers file tax returns reporting income commensurate with the amount of money they have spent during the year which they feel can be traced and documented by the government. The "source" of their income reported on these returns is usually falsely stated, misleading or generic in terms. Retained copies of these returns are commonly kept by the traffickers in their residences and businesses;

(s) That controlled substances traffickers commonly maintain addresses of telephone numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization;

(t) That drug traffickers take or cause to be taken photographs of themselves, their associates, their property and their product. That these traffickers usually maintain these photographs in their possession;

(u) That the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances; and

(v) That drug traffickers commonly have in their possession, that is on their person, at their residences and/or their businesses, firearms, including but not limited to: handguns, pistols, revolvers, rifles, shotguns, machine guns and other weapons. Said firearms are used to protect and secure a drug trafficker's property. Such property may include, but is not limited to: narcotics, jewelry, narcotics paraphernalia, books, records and U.S. currency.

3. On August 14, 2017, your affiant received information regarding Chase Christian from a Bradley County Sheriff's Office (BCSO) Confidential Source (CS) of information. This CS is a subject that is cooperating with law enforcement for the purpose of obtaining consideration from law enforcement in regards to a pending charge in Bradley County. This CS is familiar with the methods and techniques utilized by the distributors of illegal narcotics. This CS advised that he/she had been involved in illegal narcotics at an early age. This CS stated that she/he had started with using marijuana and gradually started using other types of illegal narcotics to include LSD, MDMA, and just recently heroin.

4. This CS stated that about the end of June or first of July in 2017, he/she began purchasing heroin from a Chase Christian. This CS stated that he/she would travel to the residence of Chase Christian located on Weeks Drive in Cleveland, Tennessee, at least once a day if not twice for the purpose of purchasing heroin. The CS stated that Chase Christian was charging between $20-$25 per point of heroin. This CS stated that he/she made this daily purchase for about the entire month of July and had just recently stopped using heroin.

5. The CS stated that he/she normally would purchase between 1 and 2 points of heroin at a time from Chase Christian. The CS also stated that there was always more heroin at the residence and has seen Chase Christian with what was believed to be 1/2 to one ounce of heroin. The CS stated that Chase Christian has a couple of pistols in the residence and that a lot of subjects that come to the house also have weapons. The CS stated that Chase Christian also made the remark that he would get his heroin from someone in Chattanooga. The CS stated that there has been several times that the CS has been at the residence of Chase Christian and it was packed full of people.

6. This CS advised to investigators and this affiant that Chase Christian was a clean cut white male subject who had told the CS that he was a member of the Gangster Disciple street gang. The CS

stated that Chase Christian resides at 709 Weeks Drive NE in Cleveland Tennessee. The CS stated that Chase Christian would drive a gray Honda Repsol motorcycle at one time and also had a Dodge Charger. The CS stated that Chase Christian has stated that his motorcycle has been stolen and he does not drive often because his license is suspended. The CS also provided the telephone number for Chase Christian as (423) 464-8203.

7. To corroborate the information provided from the CS, on August 14 and August 24, 2017, your affiant met with the CS at undisclosed locations within Bradley County to attempt controlled purchases of heroin from Chase Christian. To ensure a proper and prosecutable case on both occasions law enforcement searched the CS and CS's vehicle for any contraband, and none was located. The CS was fitted with a recording device capable of recording the conversation during the controlled purchase. The CS was also provided TBI confidential funds to utilize in the purchase of heroin from Chase Christian.

8. On both dates, upon completion of the listed procedures, the CS was directed to place a controlled and recorded phone call to Chase Christian at the telephone number the CS provided. During these controlled and recorded phone calls, your affiant could overhear the conversation between the CS and Chase Christian. During these conversations, Chase Christian informed the CS that he did have heroin to sell and for the CS to come to the residence. Based on the above phone calls, law enforcement followed the CS from the undisclosed meeting location directly to the residence of Chase Christian located at 709 Weeks Drive NE in Cleveland Tennessee. Law enforcement observed the CS in the driveway of this residence and, thereafter on separate occasions described below, either walking to the door of the residence or meeting with Chase Christian in the front yard.

9. On one occasion, law enforcement observed the CS enter the residence of 709 Weeks Drive NE. On another occasion, law enforcement observed the CS meet with Chase Christian in the front yard

of this address. Upon meeting with Chase Christian, either in the residence or the front yard, the CS began a conversation with Chase Christian discussing the purchase of a pre-determined amount of heroin. On both occasions, Chase Christian agreed to sell the amount of heroin to the CS, and the CS utilized the TBI marked confidential funds to make the purchase.

10. After both purchases, upon exiting the area of the residence, law enforcement followed the CS away from the residence directly to an undisclosed location. Upon arrival at this undisclosed location, the CS turned over a quantity of heroin and the electronic monitoring equipment. The CS and the CS's vehicle were searched for any contraband, and none was located. The CS was debriefed regarding the purchase of the heroin, and on each occasion advised that Chase Christian provided the heroin to the CS and was given the TBI marked confidential funds by the CS. On one of these occasions, the CS stated that he/she observed more heroin in resale quantities.

11. Based on the above information as well as the two controlled purchases from Chase Christian, agents have conducted additional surveillances of the residence located at 709 Weeks Drive NE. As a result of these surveillances, agents have observed numerous vehicles and subjects arriving at the residence, staying for a short amount of time, and then leaving. Based on your affiant's training and experience, these actions are consistent with the distribution of illegal narcotics. Several of the subjects identified as either drivers or registered owners of the vehicles observed at the residence have been found to have criminal histories for illegal narcotics. One of these subjects identified during these surveillances was identified as Nicholas Beauvais.

12. Law enforcement observed Nicholas Beauvais coming and going to the residence of Chase Christian during these surveillances. During the investigation into Chase Christian, your affiant has also conducted controlled purchases of heroin from Nicholas Beauvais on two separate occasions. During

one of these controlled purchases, Nicholas Beauvais was observed driving to the residence of Chase Christian prior to the sale of heroin as well as returning to the residence upon completion of the sale of heroin to a CS.

13. Subsequent to the second controlled purchase of heroin from Nicholas Beauvais (after he was observed coming and going from the residence of Chase Christian), a traffic stop was conducted of him for a traffic violation. During the traffic stop and consent search, Agents did not locate any illegal narcotics but did locate paraphernalia consistent with the use of heroin. Nicholas Beauvais was approached by your affiant during this traffic stop and provided proper identification. Nicholas Beauvais was verbally provided his *Miranda* Rights as witnessed by BCSO Det. David Marlow and asked if he would speak to your affiant. Nicholas Beauvais waived his rights and agreed to speak to your affiant and did provide a statement to your affiant.

14. During this statement of Nicholas Beauvais he admitted that he had been selling small quantities of heroin for approximately 2-3 months. He stated that he primarily sells heroin to support his and his girlfriend's drug habit. He also stated that he had gotten heroin from Chase Christian in the past at Chase Christian's residence on Weeks Drive. Nicholas Beauvais stated that Chase Christian is involved in the distribution of heroin from that residence. Nicholas Beauvais agreed to cooperate with law enforcement if he could be allowed to contact this affiant a few days later. Nicholas Beauvais was provided a contact number for this affiant and he did not make contact with this affiant.

15. On September 5, 2017, your affiant along with other law enforcement met with the same CS utilized above at an undisclosed location within Bradley County. The purpose of this meeting was to conduct a controlled purchase of heroin from Chase Christian. As with the two prior controlled purchases and to ensure a proper and prosecutable case, law enforcement conducted a search of the CS and the CS

vehicle and no contraband was located. The CS was fitted with an electronic device capable of recording the conversation during the controlled purchase. The CS was provided marked TBI confidential funds to utilize in the purchase of the heroin.

16. Upon completion of the above procedures, law enforcement followed the CS directly from this undisclosed location to the residence of Chase Christian located at 709 Weeks Drive NE in Cleveland Tennessee. Upon arrival at this residence, the CS was observed parking in the driveway and walking to the front door. Your affiant observed the CS enter into the residence.

17. Upon entering the residence, the CS began a conversation with Chase Christian discussing the purchase of the pre-determined amount of heroin. Chase Christian agreed to sell the CS the heroin, and the CS made the drug purchase using the marked TBI confidential funds. Your affiant then observed the CS return to the CS's vehicle and leave.

18. The CS left Chase Christian's residence, and law enforcement followed the CS directly to an undisclosed location in Bradley County. Upon arriving at this location, the CS turned over a quantity of heroin and the electronic equipment utilized during the purchase. Law enforcement then searched the CS and the CS's vehicle and located no contraband. Law enforcement debriefed the CS, who advised that Chase Christian conducted the heroin sale and was provided the marked TBI funds. The CS advised that he/she observed more illegal narcotics in the residence.

19. Based upon my training, experience, and knowledge, your affiant is aware of the fact that drug traffickers often keep evidence, fruits of the crime, and instrumentalities at their residence and in their vehicles. Similarly, individuals involved in drug trafficking often keep books, records, and other documents which relate to their illicit activities at their residence and in their vehicles.

20. The affiant submits that probable cause exists to believe that Chase Christian has been

involved in heroin distribution for at least the past several weeks and has utilized his residence and premises to further his violations of federal drug laws. Your affiant further believes that probable cause exists to have the residences/properties/outbuildings/vehicles of Chase Christian searched for the following items:

(1) Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2) Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3) Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4) United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5) Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular ~~marijuana~~ heroin RDW but not limited to scales, baggies, packing material;

(6) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes

Page 11 of 12

and keys;

(7) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8) Papers, tickets, notes schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms;

(10) Any and all other material evidence of violations of 21 U.S.C. §§ 841, 843, 846, and 881, including manufacturing, possessing with intent to distribute, and distributing controlled substances.

_____
SA RODD WATTERS, AFFIANT
Tennessee Bureau of Investigation

Sworn to and subscribed before me this
___15th___ day of September, 2017

_____
HON. CHRISTOPHER H. STEGER
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

IN THE MATTER OF THE SEARCH OF  )
THE RESIDENCE, PREMISES,        )   CASE NO. 1:17-MJ-_____
OUTBUILDINGS, AND VEHICLES      )
LOCATED AT 709 WEEKS DRIVE NE,  )
CLEVELAND, TENNESSEE            )

## ATTACHMENT A

### DESCRIPTION OF THE RESIDENCE/PREMISES/PROPERTY TO BE SEARCHED

The residence, premises, outbuildings, and vehicles located at 709 Weeks Drive NE in Cleveland, TN. The residential property to be searched is a duplex residence that may be entered via a door on the left side of the property, when viewing the property from the street.



UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

IN THE MATTER OF THE SEARCH OF        )
THE RESIDENCE, PREMISES,              )   CASE NO. 1:17-MJ-143
OUTBUILDINGS, AND VEHICLES            )
LOCATED AT 709 WEEKS DRIVE NE,        )
CLEVELAND, TENNESSEE                  )

## ATTACHMENT B

### LIST OF ITEMS AUTHORIZED TO BE SEARCHED-FOR AND SEIZED PURSUANT TO SEARCH WARRANT

The property is described as provided in Attachment A, appended hereto.

(1) Books, photographs, records, receipts, notes, ledgers and other papers which show the transportation, ordering, purchase, distribution, possession, sale or manufacture of controlled substances;

(2) Address and/or telephone books and papers reflecting names, addresses, and/or telephone numbers, written or typed by hand as opposed to printed commercially;

(3) Books, letters, records, computerized and electronic records, receipts, bank statements and records, money drafts, letters of credit, wire transfers, safe deposit box keys, money order and cashier's check receipts, passbooks, bank checks, and other items that reflect the expenditure, obtaining, secreting, transfer or concealment of drug proceeds;

(4) United States currency, precious metals, jewelry, and financial instruments, including, but not limited to, stocks and bonds, notes and other documents showing an accumulation of assets, wealth, or money to the extent that these items are found in such quantity, substance and/or quality as to permit a reasonable inference that such items are proceeds of drug trafficking;

(5) Controlled substances, material and paraphernalia for manufacturing, packaging, cutting, weighing and distributing controlled substances, in particular ~~marijuana~~ heroin RDW but not limited to scales, baggies, packing material;

(6) Indicia of occupancy, residency, and/or ownership of the premises described above and other real property, including but not limited to deeds, utility and telephone bills, canceled envelopes and keys;

(7) The visual image, by way of photography, of all furnishings and equipment in, on, under, attached, or appurtenant to said premises;

(8) Papers, tickets, notes, schedules, receipts and other documents relating to travel to and from drug source areas and drug distribution areas;

(9) Firearms; and

(10) Any and all other material evidence of violations of 21 U.S.C. §§ 841, 843, 846, and 881, including manufacturing, possessing with intent to distribute, and distributing controlled substances.